# Exhibit 52

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DONALD SMILIE, et al. | ) |
| | ) Case No. 07-CV-3231 |
| | ) |
| Plaintiffs | ) |
| | ) Judge Shadur |
| v. | ) Magistrate Judge Cole |
| | ) |
| COMCAST CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PROCEDURAL BACKGROUND AND CONCLUSIONS OF LAW

## PROCEDURAL BACKGROUND

On June 8, 2007 Plaintiff Donald Smilie ("Smilie") filed his Complaint, alleging that Defendants Comcast Cable Communications Management, LLC (misnamed as Comcast Corporation, D/B/A Comcast Cable, Inc.) ("Defendant Comcast"), Frontline Communications, Inc. ("Defendant Frontline" or "Frontline"), KAPPI, Inc., Mexitelcom, Inc., Streamline Communications, Inc. and All Other Third-Party Contractors, Unknown, jointly employed and failed to pay Smilie, on behalf of himself and other plaintiffs known and unknown, overtime wages, in violation of the Fair Labor Standards Act, 29 U.S.C. §201 et seq. (Doc. No. 1, ¶¶ 13-14.) Smilie sought to bring this case as a nationwide collective action pursuant to 29 U.S.C. § 216(b).[1] (Doc. 1, ¶ 8.)

On September 24, 2007 Plaintiffs Juan Samayoa, John Munoz and Pablo Sanchez were added as party plaintiffs (Doc. No. 43.); on November 19, 2007 Plaintiff Slawomir Kiraga was

---

1 Smilie also sought to pursue wage and hour claims under Illinois state law as a class action pursuant to Fed. R. Civ. P. ("Rule") 23. (Doc. No. 1, ¶¶ 9-10.) Those claims were dismissed on July 13, 2007. (Doc. No. 16.)

added as a party plaintiff (Doc. No. 53.); and on December 20, 2007 Plaintiffs Brian DeSanctis and Rolando Pacheco were added as party plaintiffs. (Doc. No. 62.)

On September 25, 2008 this Court entered an Order Approving Settlement Between Plaintiffs and Defendant Frontline Communications and dismissed Defendant Frontline with prejudice, finding no just reason for delay of enforcement of this order, as contemplated under Rule 54(b). (Doc. No. 80.)

On October 28, 2008 this Court entered an Order Approving Settlement Between Plaintiff Munoz and Defendant Streamline Communications, Inc. and dismissed Defendant Streamline with prejudice, finding no just reason for delay of enforcement of this order, as contemplated under Rule 54(b). (Doc. No. 86.)

On February 23, 2009 all Plaintiffs and Defendant Comcast (collectively, "the Parties") submitted to this Court Stipulated Findings of Fact, citing record evidence in the form of deposition testimony supporting the same. (Doc. No. 95.) This Court accepts the Parties' Findings of Fact as true for purposes of reaching the following Conclusions of Law.[2]

## CONCLUSIONS OF LAW

I. **Whether Comcast Jointly Employed Smilie and Other Contract Technicians Is a Question of Law.**

1. Smilie alleges that he and others similarly situated to him were jointly employed by Defendants Frontline and Comcast under the Fair Labor Standards Act ("FLSA") and that Defendants therefore owe them overtime pay and other damages under the FLSA. (Compl. ¶¶ 5, 6, 14). Defendant Comcast denies that it ever jointly employed Smilie or any other Frontline contract technician. (Ans. ¶¶ 5, 6, 14.)

---

[2] The Parties' Stipulated Findings of Fact are cited herein as "Facts ¶ __".

2

2. As there are no material facts in dispute, whether Comcast is a joint employer of Smilie and other Frontline contract technicians is a question of law. *See Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206-08 (7th Cir. 1986) (per curium), affirming finding of joint employment where two employers had an arrangement to share the plaintiff's services and both shared control of the plaintiff.

## II. Comcast Did Not Jointly Employ Frontline Contract Technicians Because It Did Not Exercise Control Over Their Working Conditions.

3. Under Department of Labor regulations, when an employee performs work that simultaneously benefits two or more employers, a joint employment relationship generally will exist:

> (1) where there is an arrangement between employers to share the employee's services, as for example to interchange employees; or
>
> (2) where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*See* 29 C.F.R. §791.2(b).

4. *Moldenhauer v. Tazewell-Pekin Consol. Commun'ns. Ctr.*, 536 F.3d 640, 643-44 (7th Cir. 2008), quoting 29 C.F.R. §825.106(a),[3] recently recognized in the context of joint

---

[3] As *Moldenhauer*, *id.* citing 29 C.F.R. §825.106(a) and 29 C.F.R. §791.2(b) noted, the joint employer regulation in the FLSA mirrors that under the FMLA, and thus the same standard applies under the two statutes.

3

employment under the Family and Medical Leave Act that "this regulation, which focuses on whether multiple entities exercise 'some control' over the employee, does not answer the question before us and does not even provide much guidance in determining the parameters of what constitutes a joint-employment relationship."

5. Plaintiff Moldenhauer urged the Seventh Circuit to adopt a multifactor test similar to that applied in *Moreau v. Air France*, 343 F.3d 1179, 1183 (9th Cir. 2003), for determining whether a joint relationship exists (see 536 F.3d at 644). The *Moreau* factors are whether the alleged employer "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records" (*Moldenhauer*, 536 F.3d at 644, quoting *Moreau*, 343 F.3d at 1183 (internal quotation marks and citation omitted)).

6. *Moldenhauer, id.* (emphasis in original) declined to adopt that or any other multifactor test, noting that while those factors were "certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important." Rather *Moldenhauer, id.* (citing *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007)) held "generally that for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case."

7. In applying that standard, *Moldenhauer, id.* relied on *Grace v. USCAR*, 521 F.3d 655, 667 (6th Cir. 2008), where, although a staffing agency paid and gave benefits to the plaintiff, the alleged joint employer "supervised the plaintiff's day-to-day activities and determined her salary and hours." Thus, after analyzing "the totality of the plaintiff's

4

employment situation," *Grace, id.* had "found that a joint-employment relationship existed because both employers maintained control over the employee."

8. In contrast, *Moreau*, 383 F.3d at 1190 had held that an airline was not a joint employer because, as *Moldenhauer*, 536 F.3d at 644 said, it:

> did not maintain any authority to control the workers, i.e., it could not hire or fire employees, determine salaries, or direct day-to-day activities. [citing *Moreau*] Instead, the airline only evaluated whether the contracted-for services were supplied satisfactorily.

Thus *Moldenhauer*, 536 F.3d at 645 stressed that in *Moreau*, "the alleged secondary employer simply contracted for services provided by the primary employer – it had no actual control over the employee – and no joint-employment relationship was found to exist."

9. *Moldenhauer, id.* found no joint-employment relationship in that case because the alleged joint employer did not hire a single employee, determine the working conditions or decide the compensation of the plaintiff, and was not contacted for permission to fire the plaintiff. Thus no control was exercised, and under the totality of the circumstances there was no joint employment relationship under the FMLA (*id.*).

10. Here as in *Moreau* Comcast simply contracted with Frontline for the provision of cable installation and repair services. (Facts ¶¶ 7-11.) Under the *Moldenhauer* analysis it is apparent that Comcast had no actual control over Smilie or any other contract technician.

### A. Comcast Had No Authority To Hire Contract Technicians.

11. Comcast had no authority to and did not hire Smilie or any other Frontline contract technician. (Facts ¶ 16.) Rather Frontline decided, with no input from Comcast, to use contract technicians to perform services under its contract with Comcast. (Facts ¶ 12.) Frontline recruited those technicians, developed its own "Independent Contractor Agreement" with each of

5

those technicians and performed background checks on them– the results of which were merely reported to Comcast. (Facts ¶¶ 15-17.)

12. Only in rare circumstances did Comcast deny a prospective Frontline contract technician authorization to perform work for Comcast customers. (Facts ¶ 19.) Comcast's determination that an individual was "non-badgeable" was not a determination that Frontline could or should not contract with the technician (id.) The fact that Comcast had no authority to hire contract technicians shows that Comcast did not exercise control over Smilie's and other contract technicians' working conditions and is not a joint employer.

### B. Comcast Did Not Supervise Day-To-Day Activities Of Contract Technicians Nor Control Their Working Conditions.

13. Comcast did not supervise Smilie or any other contract technician's day-to-day activities, nor did it control their working conditions. Comcast neither provided nor required any particular training for contract technicians. (Facts ¶ 20.) Nor did Comcast provide contract technicians with any vehicles, tools, uniforms or insurance. (Facts ¶¶ 21-28.) Comcast's contract with Frontline merely required that contract technicians wear long pants, not shorts, and wear shirts identifying them as authorized "contractors" for Comcast, while performing service for Comcast customers. (Facts ¶ 24.) Such "contractual concepts alone do not satisfy the 'economic realities' test" (*Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1327 (S.D. Fla. 2001), declining to find joint employment where contract required that cable installers be neatly dressed and polite.

14. Comcast also did not assign work to contract technicians. Comcast simply gave work to Frontline pursuant to the contract, work that Frontline was free to perform using whatever staffing manner it chose. (Facts ¶¶ 29, 39.) Comcast's WFX software did provide initial routing suggestions based on lists of contract technician ID numbers that Frontline

6

provided to Comcast; but Frontline was free to and did make unlimited changes to those assignments. (Facts ¶¶ 33-43.) Comcast did not assign work to any particular contract technician – it made no difference to Comcast which Frontline subcontractor did the work. (Facts ¶¶ 39-43.)

15. Comcast also did not dictate the order and manner in which the service was performed. (Facts ¶¶ 44-47.) So long as the Comcast customer received service within the time window promised, the contract technicians came and went as they chose, including taking breaks when they chose and ending their work day early. (*Id.*) In fact, even if the promised time window was missed, Comcast did not have the authority to penalize any individual contract technician – Frontline manages its relationship with contract technicians. (Facts ¶¶ 74, 82-83.)

16. While Comcast supervisors rode along with Comcast's employee technicians, no Comcast supervisor ever supervised Smilie or any other contract technician as they performed their work. (Facts ¶ 45.) *Cf. Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007), finding joint employment where Remington posted supervisors in the fields to inspect the work and tell the crew when the job had to be re-done. Here Comcast had extremely limited contact with contract technicians. (Facts ¶¶ 71-75.) Almost all of Comcast's communications were directed to Frontline managers. (*Id.*)

17. Comcast's requiring Frontline (and its contract technicians) to meet Comcast's quality standards is not an indication of control and is entirely consistent with the role of a contractor who is hired to perform highly technical duties *(see Santelices*, 147 F. Supp. 2d at 1327, holding installer failed to establish joint employment relationship between cable installation company and outsourcing company that secured installer's services, despite installer's testimony that installation jobs were to be done to cable company's specifications and

7

cable company would check the work for quality control purposes). The fact that Comcast inspected contract technicians' work for purposes of quality control and passed that information on to Frontline does not demonstrate the type of control characteristic of an employment relationship.

18. Comcast also asserted no control with respect to the type and variety of work contract technicians did for Frontline. (Facts ¶ 31-32.) Similarly, Comcast did not restrict contract technicians' ability to perform any type of services that they chose, for anyone they chose. (Facts ¶ 30.)

19. In sum, Comcast did not supervise Plaintiffs' day-to-day activities or control their working conditions. Accordingly, Comcast was not a joint employer of Plaintiffs (*see Santelices*, 147 F. Supp. 2d at 1327, finding no joint employment where there was no evidence that cable company checked work on a daily basis, gave work commands or otherwise intervened in the performance of duties on a daily basis or anytime).

### C. Comcast Did Not Pay Contract Technicians.

20. Comcast had no involvement in determining the method by which or the rates that Frontline paid its contract technicians. (Facts ¶ 76.) In fact, according to Frontline's owner, those rates were not even tied to Comcast's contractual rates with Frontline, but rather to the market value of the contract technicians' services. (*Id.*) The fact that Comcast was not involved in Plaintiffs' pay confirms its lack of control over their working conditions (*see Santelices*, 147 F. Supp. 2d at 1327).

### D. Comcast Has No Authority To Fire Contract Technicians.

21. Finally, Comcast had no authority to discipline or fire contract technicians. (Facts ¶ 82-83.) Comcast managed the performance of Frontline's obligations under their contractual relationship; Comcast did not manage the performance of any individual contract technician.

8

(Facts ¶ 67-70, 74, 82-83) Comcast had no involvement in the firing of Smilie or any other contract technician. (Facts ¶ 83.) Where Comcast had no authority to discipline or fire Plaintiffs, it did not control their working conditions.

22. Thus, considering the totality of the circumstances, Comcast was not a joint employer of Plaintiffs under the FLSA (*see Moldenhauer*, 536 F.3d 645, holding no joint employment where alleged employer did not hire, determine working conditions, decide compensation, or give permission to fire).

February 25 2009
2-25-2009

_____
Milton E. Shadur, United States District Judge

DB1/62423415.2

9