UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENEQUE JEAN-LOUIS, ANGEL PINAREYES,
TOMAS TORRES-DIAZ, ROSELIO MENDOZA,
EDWIN PEGUERO, JONNATAL PERALTA, and
ROBIN SORIANO, Individually and on Behalf of
All Other Persons Similarly Situated,

                              Plaintiffs,

              -against-

METROPOLITAN CABLE COMMUNICATIONS,
INC., RICHARD PANG, JOHN SNYDER, BILL
BAKER, PATRICK LONERGAN, JOHN GAULT,
and TIME WARNER CABLE of NEW YORK
CITY, a DIVISION OF TIME WARNER
ENTERTAINMENT CO., L.P.,

                              Defendants.

09 Civ. 6831 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

        In this action, Plaintiffs are current or former employees of defendant

Metropolitan Cable Communications, Inc. ("Metro") who work as technicians installing

telecommunications services provided to New York City residents by defendant Time

Warner Cable of New York City ("Time Warner").  Purporting to represent a class of

fellow Metro technicians, Plaintiffs allege that defendants—Metro, Metro executives, and

Time Warner—did not pay them for overtime at the "time and a half" rates required by

the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA").  Time Warner has

moved for summary judgment on the ground that the FLSA only applies to an

"employer" and there is no genuine issue of material fact precluding the Court from

determining as a matter of law that Time Warner was not Plaintiffs' employer.  For the

following reasons, the Court agrees and grants Time Warner's motion.

1

# BACKGROUND

Time Warner provides cable services to over one million subscribers in the New York City area. (*See* Pl.'s 56.1 Stat. ¶ 1.) To install cable for these subscribers, Time Warner contracts with Metro and two other companies, Uptown Communications & Electric ("Uptown"), and Broadband Express, neither of whom is a party to this action. (*See* Pl.'s 56.1 Stat. ¶ 2.) During the time period relevant to this action, Metro contracted only with Time Warner. (*See* Pl.'s 56.1 Stat. ¶ 4.)

Metro, not Time Warner, hires technicians to perform installations at Time Warner customers' homes. (*See* Pl.'s 56.1 Stat. ¶ 2.)[1] Prospective technicians apply directly to Metro, interview with Metro personnel at Metro's facility, hear from Metro personnel that they have been hired, and receive paperwork from Metro. (*See* Pl.'s 56.1 Stat. ¶¶ 15-18.) None of the Plaintiffs met or communicated with anyone from Time Warner prior to being hired by Metro. (*See* Pl.'s 56.1 Stat. ¶ 19.) Time Warner requires Metro to conduct criminal background checks on prospective technicians, but it does not require Metro to provide the results of those checks. (Pl.'s 56.1 Stat. ¶ 158; Dec. of S. Silverman, Nov. 8, 2010 ("Silverman Dec.") Ex. 41 at 95.) In fact, Metro is not even required to inform Time Warner when it hires a technician. Metro assigns each technician a number and approximately every six months provides Time Warner with a list of technicians and their numbers. (*See* Def.'s 56.1 Stat. ¶ 13; Pl.'s 56.1 Stat. ¶ 103.)

When Metro hires a technician, the relationship between Metro and the technician is governed by a collective bargaining agreement ("CBA") between Metro and Local 3,

---

[1] Time Warner also employs some technicians who are capable of performing installations. (*See* Pl.'s 56.1 Stat. ¶ 2.) However, the parties do not appear to contest that Time Warner contracts with Metro, Uptown, and Broadband Express to perform the overwhelming majority of installations.

International Brotherhood of Electrical Workers ("Local 3").  (*See* Defs.' 56.1 Stat. ¶ 35; Pl.'s 56.1 Stat. ¶ 35.)  Among other things, the CBA provides for a 40 hour work week; specifies pay rates for work during that regular week; provides for "time and a half" rates for overtime and work on holidays and double rates for work on Sundays; regulates vacation periods as well as personal, sick and bereavement days; and provides for pension fund contributions.  (*See* Pl.'s 56.1 Stat. ¶ 37.)  Time Warner is not a party to the CBA and did not participate in negotiating it.  (*See* Pl.'s 56.1 Stat. ¶ 36.)

Metro equips new technicians with radios; a set of the tools that Time Warner has indicated are necessary to perform installation work; uniforms that display the Metro logo; and, in some cases, trucks with Metro logos that reside at Metro's facility.  (*See* Pl.'s 56.1 Stat. ¶¶ 48, 50, 59, 65-68.)  Metro also provides technicians with a Metro identification card.  (*See* Pl.'s 56.1 Stat. ¶ 61.)  Time Warner's agreement with Metro requires Metro technicians to report to Time Warner's facility to obtain an additional identification card that contains the words "Contractor," "Metropolitan," and "Time Warner."  (*See* Pl.'s 56.1 Stat. ¶ 64.)[2]  Metro technicians do not visit Time Warner's facility for any other reason.  And Time Warner provides only (a) the cable boxes and other similar devices that Metro technicians connect in customers' homes and (b) so-called "lock box keys" that provide access to cable connections in the field.  (*See* Pl.'s 56.1 Stat. ¶¶ 53-57.)

---

[2] Time Warner's agreement with the Borough of Queens to provide cable services in Queens requires that any Time Warner contractor who "routinely comes into contact with members of the public at their places of residence must wear a picture identification card indicating his or her name, the name of such subcontractor" and Time Warner.  (*See* Pl.'s 56.1 Stat. ¶ 62.)

3

New technicians train by shadowing Metro personnel in the field.  (*See* Pl.'s 56.1 Stat. ¶¶ 42-44.)  Technicians also attend periodic training sessions regarding new products and work specifications.  (*See* Pl.'s 56.1 Stat. ¶¶ 42-44.)  There is evidence that Time Warner personnel attended and provided documents used at some of these training sessions, in particular a session regarding customer relations.  However, the parties dispute the extent to which Time Warner personnel train Metro technicians.  On the other hand, there is documentary evidence that Time Warner sends Metro so-called "Tech Tips" and other communications containing installation specifications, and Plaintiffs testified that Metro distributed similar communications to Metro technicians.  (*See* Dec. of R. Asher, Dec. 22, 2010 ("Asher Dec.") Ex. 2 at 31; *id.* Exs. 44-48; Pl.'s 56.1 Stat. ¶ 126.)

Metro technicians report to work at Metro's facility at times specified by Metro managers and are required to contact Metro managers if they will be late or absent.  (*See* Pl.'s 56.1 Stat. ¶¶ 70, 71.)  None of the Plaintiffs has ever contacted Time Warner for that reason.  (*See* Pl.'s 56.1 Stat. ¶ 72.)  By the time that technicians arrive at work, Time Warner has provided Metro with 700-800 work orders based on installation requests from Time Warner customers.  (*See* Pl.'s 56.1 Stat. ¶ 73.)[3]  The work orders specify time windows of several hours in which Metro must perform the services the customer has requested.  (*See* Pl.'s 56.1 Stat. ¶ 74.)  However, the work orders do not contain any instructions as to how Metro should assign technicians to implement them.  (*See* Pl.'s 56.1 Stat. ¶ 75.)  Rather, Metro managers organize the work orders into routes and distribute them to technicians as they arrive.  (*See* Pl.'s 56.1 Stat. ¶¶ 76-78.)  On some

---

[3] By that time, Time Warner has also provided Metro with cable boxes and other devices. (*See* Pl.'s 56.1 Stat. ¶¶ 54-57.)

occasions, several of the Plaintiffs did not receive a route if they arrived at work late. (*See* Silverman Dec. Ex. 48 at 136-37.)

Metro technicians normally perform their work alone.  However, their work does require some communication with both Metro and Time Warner.   Metro technicians sometimes call Metro foremen regarding technical issues or missing equipment.  (*See* Pl.'s 56.1 Stat. ¶¶ 80, 81.)  And Metro technicians contact Time Warner if they have difficulty installing a modem; if a customer asks to make changes to the Time Warner service he or she has ordered; if a customer is not at home; or if the technician encounters difficulties accessing the premises.  (*See* Pl.'s 56.1 Stat. ¶ 80.)  In addition, Metro technicians contact Time Warner's automated ARU system to connect customers' cable service.  In doing so, the technicians report the time that they began the installation job and the automated system records the connection time as the time that the technician completed the job.  (*See* Pl.'s 56.1 Stat. ¶ 154.)

Both Metro and Time Warner assess the technicians' work.  Metro foremen conduct some quality control inspections.  (*See* Pl.'s 56.1 Stat. ¶ 82.)  Time Warner personnel do more:  they conduct some 800-900 quality control assessments per week, amounting to 2-4% of all installations that Metro technicians perform.  (*See* Pl.'s 56.1 Stat. ¶ 86.)  Time Warner memorializes in writing the results of these assessments and provides copies to Metro.  (*See* Pl.'s 56.1 Stat. ¶ 88.)  Time Warner also contracts with an outside vendor to contact customers within 45 minutes regarding installations that Metro technicians have performed at their homes.  (*See* Pl.'s 56.1 Stat. ¶ 96.)   In this system, known as ECHO, Metro and Time Warner have access to customers' responses in real time.  (*See* Pl.'s 56.1 Stat. ¶ 97.)  Finally, Time Warner compiles and provides to Metro

data as to how often technicians use Time Warner's automated systems, a snapshot of the number of open and completed installations, how often Metro technicians complete installations in specified time windows, and how often technicians must make additional visits to correct installation problems. (*See* Def.'s 56.1 Stat. ¶ 92; Pl.'s 56.1 Stat. ¶¶ 92, 144-154.)

Time Warner and Metro discuss these assessments and reports at monthly meetings. (*See* Pl.'s 56.1 Stat. ¶¶ 93-94, 168-70.) Metro uses the assessments and reports in determining if, when, and how to discipline Metro technicians. (*See* Def.'s 56.1 Stat. ¶¶ 90, 143.) In addition, Plaintiffs have presented evidence that Time Warner contacts Metro regarding the worst performing technicians and asks Metro to advise "what actions will be taken." (*See* Silverman Dec. Exs. 29-30.) However, though the parties dispute whether Metro or Time Warner was actually responsible for disciplining or firing certain technicians, the record does not contain any evidence that Time Warner has ever instructed Metro to discipline or fire any individual technician. Neither of the Plaintiffs who were terminated discussed his termination with anyone from Time Warner; rather, both were notified by Metro personnel. (*See* Pl.'s 56.1 Stat. ¶¶ 24-25.)

It is undisputed that Time Warner has the power to remove any Metro technician from the list of technicians authorized to perform installations at Time Warner customers' homes. (*See* Pl.'s 56.1 Stat. ¶¶ 29-30.) Yet Time Warner's decision to de-authorize a technician does not mean that the technician can no longer work for Metro or perform installations for Time Warner. A de-authorized technician can perform other kinds of work for Metro or leave Metro to install Time Warner cable as an Uptown or Broadband Express employee. (*See* Pl.'s 56.1 Stat. ¶¶ 31, 34.)

At the end of each week, Metro provides Time Warner with an invoice for every job that Metro technicians have completed and requests payment at per-job rates established by Time Warner.  (Asher Dec. Ex. 2 at 30.)  Metro identifies the rate applicable to a given job based on the rate code that Time Warner has assigned to that job and which appears on the work orders.  (Pl.'s 56.1 Stat. ¶ 35; Asher Dec. Ex. 3 at 45-46.) Time Warner checks the invoice against its own data regarding the number of completed installations, deducts faulty installations, and pays Metro the difference.  (*See* Aff. of J.W. Baker Jan. 25, 2011, ¶ 2; Asher Dec. Ex. 2 at 93-94.)  Pursuant to the CBA with Local 3, Metro pays its technicians at fixed rates for each hour of work. (*See* Silverman Dec. Ex. 44 at 54-55, 60; Ex. 46 at 22-23; Ex. 47 at 25-26; Ex. 48 at 48; Asher Dec. Ex. 18 ¶ 6.)  Metro also provides additional compensation based on the number of jobs that a technician completes.  (*See* Asher Dec. Ex. 5 at 36; Ex. 9 at 87; Ex. 10 at 25-26; Ex. 18 ¶¶ 6-7.)  Metro technicians received payment in the form of paychecks containing a Metro logo, and these payments were reflected on W-2 forms issued by Metro.  (*See* Pl.'s 56.1 Stat. ¶ 39.)  No plaintiff ever received any payment from Time Warner.  (*See id.*)

On August 3, 2009, Plaintiffs filed this action against Metro and Time Warner alleging that they had violated the FLSA by failing to pay Metro technicians one and a half times their normal hourly wage for each hour they worked in excess of forty hours in certain weeks.   Plaintiffs filed an amended complaint on October 23, 2009.  On February 24, 2010, Plaintiffs moved to amend their complaint a second time to add a retaliation claim against Time Warner, Metro, and various Metro executives.  Specifically, Plaintiffs sought leave to allege that that the defendants had retaliated against them for filing or joining this action by reassigning them to less lucrative or more demanding routes and

assigning the most lucrative routes to new or less senior technicians.  The Court granted

Plaintiffs' motion on April 29, 2010 and Plaintiffs filed a second amended complaint on

May 5, 2010.

The parties engaged in discovery limited to the issue of whether Time Warner

jointly employed Metro technicians.  On November 8, 2010, Time Warner moved for

summary judgment on the ground that it does not jointly employ Metro technicians.

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In deciding whether there is a genuine issue of material fact as to an element essential to

a party's case, the court must examine the evidence in the light most favorable to the

party opposing the motion, and resolve ambiguities and draw reasonable inferences

against the moving party."  *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal

quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  However, a party opposing summary judgment "may not rely merely on

allegations or denials in its own pleading; rather, its response must—by affidavits or as

otherwise provided in this rule—set out specific facts showing a genuine issue for trial."

Fed. R. Civ. Proc. 56(e).

Under the law in this Circuit, "the inquiry as to whether an entity is an employer

for purposes of the FLSA involves three determinations.  First, there are historical

findings of fact that underlie each of the relevant factors.  Second, there are findings as to

the existence and degree of each factor.  Finally, there is the conclusion of law to be

8

drawn from applying the factors, *i.e.*, whether an entity is a joint employer." *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 76 (2d Cir. 2003) ("*Zheng I*"). "In order to grant summary judgment for defendants, the District Court would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, defendants are still entitled to judgment as a matter of law." *Id.* "To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76-77 (emphasis in original).[4]

## DISCUSSION

### A.  Relevant Law

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  Hence only

---

[4] The Second Circuit's statement that "[i]n the context of a jury trial, the question whether a defendant is a plaintiff[']s joint employer is a mixed question of law and fact" does not mean that joint employer determinations are never amenable to summary judgment. *Zheng v. Liberty Apparel Co., Inc.*, 617 F.3d 182, 185 (2d Cir. 2010) ("*Zheng II*").  As set forth more fully below, in *Zheng v. Liberty Apparel Company, Inc.*, 355 F.3d 61 (2d Cir. 2003) ("*Zheng I*"), the Second Circuit reversed the district court's decision to grant summary judgment on the joint employment issue and remanded for consideration of additional factors relevant to that determination.  On remand, the district court denied summary judgment on the ground that genuine issues of material fact existed regarding three of the factors the Second Circuit identified.  *See* 617 F.3d at 185.  The matter was then tried to a jury which found that the defendants were liable as joint employers.  *See id.*  The defendants appealed on the ground that the joint employer question was one for the court, not the jury.  *See id.*  In *Zheng II*, the Second Circuit rejected that argument and declined to engage in *de novo* review of the jury's verdict.  In doing so, however, the Second Circuit specifically contrasted the procedural posture of its prior decision wherein the district court had granted summary judgment:  "to the extent [the prior decision in *Zheng I*] contemplated *de novo* review of a joint employment determination, it did so only in the context of summary judgment, not a jury trial." *Id.* at 186.  Hence nothing in *Zheng II* casts doubt on the propriety of treating joint employment as a question of law where there are no genuine issues of material fact requiring a jury trial.

an "employer" can be liable for failing to pay "time and a half" rates for overtime.[5]  The instant motion turns on whether Time Warner is Plaintiffs' "employer" for purposes of the FLSA.

The term "employer" in the FLSA "includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C.A. § 203(d).  "Because the statute defines employer in such broad terms," *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), and its definitional section uses the term it purports to define, the statute "offers little guidance on whether a given individual is or is not an employer." *Id.*

In the usual case, a court faced with such an ambiguous statute might turn to how the law has elsewhere defined the employer-employee relationship.  Indeed, "[i]in instances where Congress uses terms—such as employer and employment—'that have accumulated settled meaning under . . . the common law,' courts generally infer, unless the statute indicates otherwise, that 'Congress means to incorporate the established meaning of these terms,' *e.g.*, 'the conventional master-servant relationship as understood by common-law agency doctrine.'" *Barfield v. New York City Health and Hosp. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (ellipsis in original) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992)).

However, the Supreme Court has observed that the "Act contains its own definitions, comprehensive enough to require its application to many persons and

_____

[5] The anti-retaliation provision of the FLSA also uses the term "employer."  *Cf.*  29 U.S.C. § 218c.

10

working relationships, which prior to this Act, were not deemed to fall within an

employer-employee category." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729

(1947).  In particular, the FLSA "defines the verb 'employ' expansively to mean 'suffer

or permit to work.'"  *Darden*, 503 U.S. at 326 (quoting 29 U.S.C. § 203 (g)).   This

"definition of 'employ' is broad."  *Rutherford Food Corp.*, 331 U.S. at 728; *see also*

*Zheng I*, 355 F.3d at 66.  Indeed, it is "the broadest definition" of the term "that has ever

been included in any one act."  *United States v. Rosenwaser*, 323 U.S. 360, 363 n.3

(1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo L. Black)).  And this

"striking breadth . . . stretches the meaning of 'employee' to cover some parties who

might not qualify as such under a strict application of traditional agency law principles."

*Darden*, 503 U.S. at 326.

   "An entity 'suffers or permits' an individual to work if, as a matter of 'economic

reality,' the entity functions as the individual's employer."  *Zheng I*, 355 F.3d at 66; *see*

*also Barfield*, 537 F.3d at 141 ("[T]he determination of whether an employer-employee

relationship exists for purposes of the FLSA should be grounded in 'economic reality

rather than technical concepts,' *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33

(1961) (internal quotation marks omitted), determined by reference not to 'isolated

factors, but rather upon the circumstances of the whole activity,' *Rutherford Food Corp.*

*v. McComb*, 331 U.S. at 730.").  Again, it is somewhat circular to define one who

"employs" in terms of whether "the entity functions as the individual's employer."

However, the purpose of the "economic reality" test—"to expose outsourcing

relationships that lack a substantial economic purpose"—points to a lodestar for

determining when an employer has outsourced work in name only:  the "overarching

concern is whether the alleged employer possessed the power to control the workers in question." *Herman*, 172 F.3d at 139.

Notably, control in this context is not an all or nothing concept.  "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control 'do not diminish the significance of its existence.'"  *Id.* (quoting *Donovan v. Janitorial Servs., Inc.,* 672 F.2d 528, 531 (5th Cir. 1982)).   And "even when one entity exerts 'ultimate' control over a worker, that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer under the FLSA."  *Barfield*, 537 F.3d at 148.   Accordingly, the Second Circuit has recognized that a worker can have more than one employer for purposes of the FLSA.  Indeed, "[t]he regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time." *Zheng I*, 355 F.3d at 66; *see also Barfield*, 537 F.3d at 141.  *Cf.* 29 C.F.R. § 791.2 (2003).[6]

---

[6] The relevant Department of Labor regulation, 29 C.F.R. § 791.2 (2003), provides:

(b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

How do courts ascertain "economic reality?"  The very open-endedness of the term denotes that it is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Barfield*, 537 F.3d at 141-42.  In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the Second Circuit identified four factors particularly relevant to the joint employment inquiry:  "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.'"  *Id.* at 12 (quoting *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).  The Court of Appeals has described these as factors as a test "for determining when an entity exercises sufficient formal control over a worker to be that worker's employer under the FLSA. . . ."  *Barfield*, 537 F.3d at 143.

However, "the broad language of the FLSA . . . demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA."  *Zheng I*, 355 F.3d at 69.  Hence not only is "[n]o one of the four factors standing alone . . . dispositive," *Herman*, 172 F.3d at 139, but the Second Circuit has "expressly denied" the proposition "that the four factors borrowed from the Ninth Circuit in *Carter* are the exclusive touchstone of the joint employment inquiry under the FLSA."  355 F.3d at 71.  While those factors "can be *sufficient* to establish employer status," "*Carter* did not hold . . . that those factors are *necessary* to establish an employment relationship."  *Id.* (emphasis in original).  Rather, "in certain circumstances, an entity can be a joint employer under the

FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them."  *Id.* at 70.

In *Zheng I*, the Second Circuit identified six additional factors that district courts "will find illuminating" in determining whether a putative joint employer exercises functional control:

> (1) whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

*Id.* at 71-72.  A district "court is also free to consider any other factors it deems relevant to its assessment of the economic realities."  *Id.* at 72.

"[B]y looking beyond a defendant's formal control over the physical performance of a plaintiff's work, the 'economic reality' test—which has been distilled into a nonexclusive and overlapping set of factors—gives content to the broad 'suffer or permit' language in the statute."  *Id.* at 76 (quoting 29 U.S.C. § 203(g)).  "However, by limiting FLSA liability to cases in which defendants, based on the totality of the circumstances, function as employers of the plaintiffs rather than mere business partners of plaintiffs' direct employer, the test also ensures that the statute is not interpreted to subsume typical outsourcing relationships."  *Id.*

Applying similar multifactor tests, several federal courts, including one in this Circuit, have held that telecommunications service providers such as Time Warner are not joint employers of contract technicians who install those services.  *See Lawrence v. Adderley Ind., Inc.*, No. CV-09-2309, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011);

14

*Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683 (D. Md. 2010).  *Cf. Smilie v. Comcast Corp.*, No. 07-CV-3231 (N.D. Ill.) (Slip Op., Feb. 25, 2009) (attached as Ex. 52 to Silverman Dec.).  *But see Keeton v. Time Warner Cable, Inc.*, No. 2:09-CV-1095, 2011 WL 2618926 (S.D. Ohio, July 1, 2011) (applying different Sixth Circuit test and finding material issues of fact as to joint employment issue.  Recently the Supreme Court of the State of New York, Queens County, granted summary judgment to Time Warner in a purported class action by MCC employees that raised claims virtually identical to those presently before the Court.  *Rodriguez v. Metro Cable Commc'ns, Inc.*, No. 21517/2008 (N.Y. Sup. Ct. July 26, 2011).

### B.  Application

The Court will begin its analysis by applying the four *Carter* factors "to examine the degree of formal control," if any, exercised by Time Warner.  *Barfield*, 537 F.3d at 143.  If Time Warner "lacked formal control," the Court will then apply the six *Zheng* factors and any other relevant factors "to assess whether" Time Warner "nevertheless exercised functional control" over Plaintiffs.  *Id.*

#### 1.  Formal Control

##### a.  Hiring and Firing

The first factor relevant to formal control is "whether the alleged employer . . . had the power to hire and fire the employees," *Carter*, 735 F.2d at 12.  In terms of hiring, the undisputed evidence shows that Time Warner does not receive applications from putative Metro technicians; interview or review applicants; inform applicants that they have been hired; or provide new hires with employment forms.  It is further undisputed that none of the Plaintiffs met or communicated with any Time Warner employee prior to

being hired as a Metro technician.  While Time Warner requires Metro to conduct

criminal background checks of applicants, Time Warner does not require Metro to report

the results of the background checks and Metro does so only on occasion.  (*See*

Silverman Dec. Ex. 41 at 95.)  In short, Metro, not Time Warner, has the power to hire

Metro technicians.

 Whether Time Warner has the power to fire technicians requires more extended

discussion.   It is undisputed that plaintiffs Jean-Louis and Pinareyes—the only named

plaintiffs who were terminated—learned about their termination from Metro employees

and that no Time Warner employee ever discussed the termination with Jean-Louis or

Pinareyes.  (*See* Pl.'s 56.1 Stat. ¶¶ 25-27; Silverman Dec. Ex. 44 at 101.)  Nor do

Plaintiffs point to any evidence that Time Warner actually terminated any Metro

technician.

 True, Time Warner's agreement Metro provides that Time Warner has "the right

to have removed from any [installation] site any employee agent, subcontractor or sub-

contractor of contractor who violates" certain rules of conduct.  (*See* Silverman Dec. Ex.

1 at III.F.)   That is, Time Warner has the power to "de-authorize" any Metro technician

from installing Time Warner services at customers' home while employed by Metro.  But

it is undisputed that a Metro technician whom Time Warner has prohibited from perform

installation work while employed by Metro may continue working for Metro in some

other capacity, say as a dispatcher or warehouse worker, or leave Metro and later perform

installations while working as a technician for another company.   (*See* Pl.'s 56.1 Stat. ¶¶

31, 34, 91.)  Hence Time Warner's decision to de-authorize a given Metro technician

from doing installation work while employed by Metro is not the same as a decision to

either (a) prevent a Metro technician from working for Metro altogether; or (b) prevent a Metro technician from working for another service company that does installation work for Time Warner.  It is difficult to describe a decision by Time Warner that has neither consequence as equivalent to a decision to fire a Metro technician.

Plaintiffs, however, appeal to the common sense notion that Metro has no reason to continue employing technicians who cannot perform installations or whom Time Warner—its sole source of revenue—finds problematic.  Thus Plaintiffs argue that by preventing a given Metro technician from performing installation work while employed by Metro or informing Metro that a given technician has failed quality control metrics, Time Warner can effectively eliminate any reason for Metro to continue employing a given technician.  In other words, like the plaintiffs in *Jacobson*, Plaintiffs argue that "[b]ecause the Installation Companies have virtually no positions for a technician to fill other than performing installation work for Comcast, de-authorization in effect constitutes 'firing.'"  *Jacobson*, 740 F. Supp. 2d at 689.

Time Warner notes that the *Jacobson* court rejected that argument.  Indeed, the court found that the first *Carter* factor did not weigh in favor of joint employment because it was "only in the context of quality control . . . that Comcast exercises power over the hiring or firing of technicians."  *Id.* at 689-90; *accord Lawrence*, 2011 WL 666304 at *9.  But it is unclear why that makes a difference.  For one thing, since poor performance seems like one of the most common reasons for firing an employee, recognizing an exception for the *de facto* power to fire for poor performance would threaten to swallow the rule.  For another, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the

17

FLSA, since such limitations on control do not diminish the significance of its existence." *Herman*, 172 F.3d at 139 (quotation marks omitted).  If Time Warner has the *de facto* power to fire Metro technicians for poor performance, whether or not Time Warner has the *de facto* power to fire Metro technicians for reasons unrelated to their performance would not necessarily "diminish the significance" of the power it does have.

The problem for Plaintiffs is that their economic reality argument has more to do with theory than reality.  The only evidence in the record regarding Time Warner's decision to remove Metro technicians from the list of persons authorized to perform installations indicates that Time Warner did so only in the case of a handful of technicians out of the hundreds Metro employed.  (*See* Defs.' 56.1 Stat. ¶ 32.)  Nor is there any evidence in the record that Time Warner ever asked, let alone demanded, that Metro actually fire any technician.  Plaintiffs point to several e-mails in which Time Warner personnel have inquired with Metro regarding individual technicians who performed poorly on quality control assessments.  (*See* Asher Dec. Exs. 61-62.)  Yet, as Time Warner points out, these e-mails merely show that Time Warner asked Metro what actions would be taken regarding a poorly performing technician.

It is true that Time Warner's economic leverage might have led Metro to conclude that it could not afford the risk of any action short of firing a problematic technician even if Time Warner had not explicitly demanded as much.  But there is no evidence in the record that Metro terminated any employee about which Time Warner specifically complained, never mind that Metro did so as a matter of course.  On the contrary, e-mails show that Metro personnel told Time Warner that "more information is needed when doing an analysis to grade a technician"; that "numbers on the[ir] own stand no merit";

and that one of the technicians about whom Time Warner inquired was actually "a very good tech." (*See* Asher Dec. Ex. 61; Silverman Dec. Ex. 28.)  That record undermines Plaintiffs' suggestion that a complaint from Time Warner was an order to fire.

Plaintiffs also point to Metro General Manger Bill Baker's testimony regarding a message to Metro technicians in which he stated that "they," meaning Time Warner, "will not want any tech that doesn't ground," a process designed to reduce dangerous electrocution risks, "properly in their system" and that the technicians "know what that means to [them]." (*See* Asher Dec. Ex. 2 at 229.)  However, as the testimony itself makes clear, Baker did not testify that he would terminate any technician who was removed from Time Warner's system for failing to ground.   Baker merely testified that, whether or not Time Warner had de-authorized such a technician, Metro itself would as a matter of course terminate any employee who failed to ground because Time Warner would not want such an employee to enter customers' homes.  It is hardly an admission that Time Warner had the power to fire Metro technicians to say that Metro would terminate technicians who posed a safety risk to customers of its only client and proved unable to comply with standards of service that client had identified as important.

In short, this case is far afield from *Barfield* where it was undisputed that "Bellevue had the undisputed power to hire and fire at will agency employees referred to work on hospital premises. . . ."  *Barfield*, 537 F.3d at 144.  On the contrary, considering the record as a whole, it is clear that Time Warner had no power to hire or fire any Metro technician but instead had the more limited power to de-authorize a technician. Accordingly, the first *Carter* factor does not support a finding that Time Warner jointly employed Metro technicians.

### b.    Work Schedules and Conditions

The second factor relevant to formal control is whether the putative joint

employer "supervised and controlled employee work schedules or conditions of

employment," *Carter*, 735 F.2d at 12.

It is undisputed that Metro technicians receive job assignments as follows.  Time

Warner receives requests to install Time Warner cable services.  Based on those requests,

Time Warner creates work orders identifying the customer who has made the order, the

services required, and the time window in which the customer has requested that the

services be performed.  (*See* Pl.'s 56.1 Stat. ¶ 74.)  Time Warner provides the work

orders to Metro.  (*See* Pl.'s 56.1 Stat. ¶ 73.)  However, Time Warner does not provide any

instructions as to how Metro should assign technicians to perform the work orders.  (*See*

Pl.'s 56.1 Stat. ¶ 75.)  Rather, Metro personnel organize the work orders into routes and

assign those routes to Metro technicians each morning.  (*See* Pl.'s 56.1 Stat. ¶¶ 76-78.)  It

is further undisputed that Metro tells its technicians when to report in the morning; that

technicians contact Metro if they are running late or will be absent; and that no Plaintiff

ever contacted Time Warner about those issues.  (*See* Pl.'s 56.1 Stat. ¶¶ 70-72.)

Accordingly, the undisputed facts appear to demonstrate that Metro rather than Time

Warner "supervised and controlled employee work schedules."

Plaintiffs argue that a technician's "day is fully controlled by TWCNYC's time

windows" in which Time Warner expects Metro to complete installation jobs.  (Pl.'s

Opp'n at 10.)  That argument ignores the difference between affecting and supervising or

controlling.  To be sure, the fact that Time Warner tells Metro to perform certain jobs at

certain times affects when technicians perform those jobs; if Time Warner does not send

Metro any work orders for jobs between 3 and 4 p.m., no Metro technicians will work during those hours.  However, if Time Warner does send Metro work orders for jobs between 3 and 4 p.m., Metro, not Time Warner, decides which technicians will work on which job and whether a technician will work on any jobs in that period at all.  In fact, plaintiff Pinareyes testified that on some days, Metro did not assign him any routes and the earlier he arrived at work, the better chance he had to get a route.  (*See* Silverman Dec. Ex. 48 at 136-37.)  That testimony makes clear that Time Warner did not determine whether or when Metro technicians worked.  *See Smilie*, Slip. Op. at 6 ("Comcast simply gave Frontline work pursuant to the contract, work that Frontline was free to perform using whatever staffing manner it chose."); *Cf. Moreau v. Air France*, 356 F.3d 942, 950 n.5 (9th Cir. 2004) (Air France did not control schedules of contract personnel servicing planes on the tarmac where Air France "schedule[d] its flight . . . which necessarily indicated when the services were to be performed" but contractors "remained responsible for designating which employees would report to service the aircraft").

Nor did Time Warner supervise or control Metro technicians' "conditions of employment."  In *Zheng I*, the Second Circuit cautioned that "the degree to which the defendants supervise the plaintiffs' work . . . can be misinterpreted to encompass run-of-the-mill subcontracting relationships."  *Zheng I*, 355 F.3d at 74.  Hence while "the law does not require an employer 'to look over his workers' shoulders every day in order to exercise control,'" *Barfield*, 537 F.3d at 147 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)), "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such

supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Zheng I*, 355 F.3d at 75.[7]

That admonition undercuts Plaintiffs' argument that Time Warner's "Quality Control inspectors . . . function as *de facto* supervisors of the Metro technicians." (Pl.'s Opp'n at 35). Plaintiffs go to great lengths to show that sixteen full-time Time Warner personnel conduct 800-900 random quality control assessments per week on what amounts to some 4% of all jobs; that Time Warner contracts to obtain real-time feedback regarding Metro installations directly from Time Warner customers; that Time Warner uses its assessments and the ECHO results to compile extensive and detailed data regarding these assessments; and that Time Warner provides this data to Metro and discusses it with Metro in monthly meetings. (*See* Pl.'s 56.1 Stat. ¶¶ 86-88, 90, 92-94, 96-97; 141-154). However, all of this evidence shows that Time Warner makes efforts to ensure that Metro is providing quality service; the evidence does not show that Time Warner controls the day-to-day manner in which technicians provide that service. *Cf. Jacobson*, 740 F. Supp. 2d at 691 ("Comcast's quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their

---

[7] It is true that the Second Circuit made these statements in expounding upon the fifth functional *Zheng* factor rather than the second formal *Carter* factor. But it would be strange if quality supervision "has no bearing" on "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work," *Zheng I*, 355 F.3d at 74, but nevertheless were relevant in determining whether a defendant "supervised and controlled employee work schedules or conditions of employment," *Carter*, 735 F.2d at 12. Indeed, the Second Circuit's statement in *Zheng I* that "extensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and *conditions* of plaintiff's employment," *Zheng I*, 355 F.3d at 75 (emphasis added), strongly suggests that the two inquiries are largely the same. Thus the Court will apply the second *Carter* factor bearing in mind the Second Circuit's admonition that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry. . . ." *Id.*

customers, not the nature of the relationship between the technicians and Comcast.");
*accord Lawrence*, 2011 WL 666304 at \*9; *Smilie*, Slip. Op. at 7 ("Comcast's requiring
Frontline (and its contract technicians) to meet Comcast's quality standards is not an
indication of control and is entirely consistent with the role of a contractor who is hired to
perform highly technical duties.") (internal citation omitted).

Plaintiffs make much of the fact that Metro used the quality control assessments
in disciplining technicians.  That is hardly surprising; indeed, it would be strange if Metro
ignored reports regarding its employees' performance.  However, the fact that Metro used
data from Time Warner in making decisions about its employees' conditions of
employment does not mean that Time Warner controlled those conditions where there is
no evidence that any Time Warner directly contacted any Metro technician regarding the
results of any quality control assessment or was present when any Metro technician was
disciplined.  Nor is there any evidence that Time Warner instructed Metro to take any
particular disciplinary action or provide any particular assistance to any Metro technician
on the basis of a quality control assessment.  At most, the evidence shows that Time
Warner provided the results of quality control assessments to Metro, discussed them on a
general level in monthly meetings, and occasionally inquired about what Metro planned
to do about the worst performing technicians.  That evidence cannot justify an inference
of joint employment.

There is also evidence that Time Warner played a limited role in training Metro
technicians.  For example, Time Warner personnel were present at, participated in, and
provided materials for some training sessions regarding customer care and new
equipment.  (*See* Pl.'s 56.1 Stat. ¶ 41; Asher Dec. Exs. 57, 59.)  And Time Warner sent

Metro "Tech Tips" and other training communications that Metro distributed to technicians.  (*See* Asher Dec. Exs. 44-48; Pl.'s 56.1 Stat. ¶ 126; Silverman Dec. Ex. 43 at 53-54.)  However, "even if [Time Warner]'s actions in specifying the work to be performed" and indirectly communicating those specifications to Metro technicians "do constitute some control over the work or working conditions of the employee," that does not mean that "a joint employment relationship is necessarily formed. . . ."  *Moreau*, 356 F.3d at 951.  There is no evidence that Time Warner employees participated in Metro technicians' initial training, or were present at any time other than during random quality control assessments when Metro technicians performed installations.  (*See* Pl.'s 56.1 Stat. ¶¶ 42-44.)  On the contrary, it is essentially undisputed both that trainee technicians shadowed Metro technicians rather than Time Warner personnel and that Metro foremen, not Time Warner personnel, provided assistance and retraining to poorly performing Metro technicians.  (*See id.* ¶¶ 43, 45.)

Finally, Plaintiffs point to evidence that Metro technicians communicate with Time Warner while performing their work.  For example, Metro technicians may contact Time Warner if they have difficulty installing a modem; if a customer asks to make changes to the Time Warner service he or she has ordered; if a customer is not at home; or if the technician encounters difficulties accessing the premises.  (Pl.'s 56.1 Stat. ¶ 80.) Yet this is not evidence that Time Warner controls how Metro technicians do their jobs; it is merely a function of the fact that Metro technicians install Time Warner cable. It would be quite unusual if a service provider never had any contact with its client, and the existence of such contact does not support an inference of supervision and control.

In sum, the undisputed facts demonstrate that Time Warner did not control Metro technicians' work schedules.  Plaintiffs' evidence regarding Time Warner's quality control assessments cannot establish control of work schedules or conditions of employment under the law of this Circuit.  And while Time Warner did play some minimal indirect role beyond quality control in the ongoing training of Metro technicians, the second *Carter* factor weighs strongly in the other direction.

### c.     Rate and Methods of Payment

The third factor relevant to formal control is whether the putative joint employer "determined the rate and method of payment," *Carter*, 735 F.2d at 12.  It is undisputed that the agreement between Metro and Local 3 provides for a regular eight hour day and a 40 hour work week; fixed hourly rates of compensation for work during those regular hours; "time and a half" rates for overtime work and work on holidays; and double rates for work on Sundays.  (*See* Pl.'s 56.1 Stat. ¶ 37; Silverman Dec. Ex. 10.)  It is further undisputed that Time Warner is not a party to the agreement between Metro and Local 3 and played no part in negotiating it.  (*See* Pl.'s 56.1 Stat. ¶ 36.)  And it is also undisputed that Metro technicians were paid by Metro with paychecks containing a Metro logo; that these payments were reflected on W-2 forms issued by Metro; and that no plaintiff ever received any payment from Time Warner.  (*See* Pl.'s 56.1 Stat. ¶ 39.)  These undisputed facts would seem to weigh strongly in favor of finding that Time Warner did not determine Metro technicians' "rate and method of payment."  *Cf. Jacobson*, 740 F. Supp. 2d at 692.

Plaintiffs, however, argue that "[t]he rates technicians are paid are wholly dependent on the rates TWCNYC pays to Metro."  (Pl.'s Opp'n at 12.)  The argument

runs as follows.  Time Warner assigns a billing code to each installation job depending on the type of work performed.  Those billing codes appear on the work orders for each job along with the technician number of the technician assigned to the job.  Metro technicians submit these work orders to Time Warner after completing each job.  Time Warner uses these work orders to assess whether Metro has accurately calculated in its weekly invoices the number of jobs that Metro technicians have completed.  Time Warner reconciles these numbers and deducts jobs that Time Warner does not believe have been correctly performed.  And, according to Plaintiffs, if Time Warner charges back a given job, Metro does not pay the technician for that job.  Thus Time Warner's decisions purportedly affect whether a Metro technician gets paid for a given job.

The problem for Plaintiffs is that there is no competent evidence that (a) Metro does not pay technicians for jobs that Time Warner charges back to Metro or (b) that Time Warner instructs Metro to do so.  Baker has submitted a sworn affidavit averring that "Metro does not pass the charge-back on to a technician for an installation that is not completed according to TWCNYC's specifications."  (*See* Aff. of J.W. Baker Jan. 25, 2011, ¶ 3.)  In opposition to Baker's statement, Plaintiffs submit only (1) a conclusory statement by a Metro technician that "Metro's pay of its techs is controlled by TWCNYC" (*see* Asher Dec. Ex. 16, Aff. of L.  Barco, Dec. 6, 2010 ¶ 9; *see also id.* ¶ 5), and (2) a statement by another technician that Baker told him that Metro changed the rate that it pays Metro technicians for certain jobs when Time Warner changed the billing codes for those jobs (*see* Asher Dec. Ex. 60, Aff. of R. Santana, Dec. 17, 2010, ¶¶ 47-53). The first statement cannot defeat summary judgment and the latter makes a very different

argument regarding how Metro provides additional per-job compensation, not how Metro compensates its technicians on an hourly basis—the focus of the FLSA and this suit.

It is true that the Second Circuit in *Barfield* recognized that a putative joint employer who pays a contractor based on the number of hours the contractor's employees work has an effect on the amount that the contractor will pay those employees per hour. And this might be a different case if Time Warner calculated the number of hours that Metro technicians worked and paid Metro for those hours, and then Metro used those calculations to pay its technicians. In those circumstances, Time Warner's "calculations" would have "conclusively determined the number of hours for which [the technicians] would be paid" and the hourly rate that Time Warner paid Metro would have "effectively set a cap on the hourly rate" that Metro would pay the technicians. *Barfield*, 537 F.3d at 145 (reasoning that hospital that calculated nurses' hours and paid referral agencies based on those calculations "exerted some control over [the plaintiff nurse]'s pay").[8]

But Time Warner never calculates Metro technicians' hours or compensates Metro based on those calculations. On the contrary, the crux of Plaintiff's argument is that Time Warner's rates per job effectively determines how much Metro paid its technicians *in addition* to the hourly and overtime rates set by the agreement between Metro and Local 3. Yet what Time Warner paid Metro for a given job no more determines what Metro pays technicians per hour than customers who buy a given product determine how the companies who produce the product pay the employees who actually make it. To be sure, any company A that provides revenue to company B affects what company B pays its employees, but the test is whether a putative joint employer

---

[8] Nevertheless, the *Barfield* court concluded that such a fact pattern "does not tilt decisively either way" for purposes of a *Carter* analysis. *Barfield*, 537 F.3d at 145.

determines pay rates, not whether it affects them.  To infer joint employment from the latter "would dramatically expand the FLSA to subsume traditional independent contractor relationships." *Jacobson*, 740 F. Supp. 2d at 692.  Accordingly, the third *Carter* factor weighs against finding that Time Warner jointly employs Metro technicians.

### d.    Records

 The fourth factor relevant to formal control is whether the putative joint employer "maintained employment records."  *Carter*, 735 F.2d at 12.  It is undisputed that Time Warner does not maintain personnel files for individual employees, time sheets, pay stubs, or government employment forms.  Further, it is undisputed that, unlike the defendant in *Barfield*, Time Warner never "maintained employment records on the matter most relevant to overtime obligations under the FLSA:  the *hours* worked" by individual Metro technicians.  *Barfield*, 537 F.3d at 144 (emphasis added).

Time Warner does receive from Metro lists of Metro technicians and their technician numbers—numbers which also appear on work orders that Metro technicians submit after completing installation jobs.  Further, the fact that Time Warner compiles quality control data on individual technicians suggests that Time Warner is in possession of raw data regarding how many jobs—as opposed to hours—an individual technician has completed.  Moreover, through its automated systems, Time Warner is aware of when a technician has started and completed a given job.   Hence, in theory, Time Warner could make assumptions as to an installer's travel time and roughly calculate how many hours an individual technician has worked each day.  But there is no evidence that Time

Warner does so.  Nor is there any evidence that Time Warner maintains records designed to track how many jobs an individual technician completes.

Instead, the record shows that, at most, such data appeared on quality control records that Time Warner provided to Metro or in the aggregate on documents that Time Warner used to verify that Metro correctly calculated the amount of work that Metro technicians actually performed.  (*See* Asher Dec. Exs. 23, 24, 29, 30, 31.)  However, because Metro is not required to notify Time Warner when it fires a technician (*see* Pl's 56.1 Stat. ¶ 24) and can assign a substitute technician the same technician number but only occasionally updates lists identifying the name of the technician assigned to each number (*see* Asher Dec. Ex. 2 at 26-27), it is far from clear that Time Warner's data regarding technician codes actually corresponds to data on any individual technician.[9]

Hence this is not a case where a putative joint employer "signs off on" time sheets completed by each plaintiff, "verif[ies] the number of hours worked by each" plaintiff and "then provides records of the hours worked" to the plaintiff's contractor employer who uses the records to compensate the plaintiff on a per-hour basis.  *Barfield*, 537 F.3d at 136.  Rather, this is a case where Time Warner maintains data that might be used to determine how much a plaintiff worked as a byproduct of calculating how often that plaintiff performed his work well.

---

[9] Take the following example.  Metro fires technician A with number 8706 on June 15, hires technician B on June 16, and assigns him number 8706.  Time Warner does not receive an updated technician list until July 1.  In that case, Time Warner could not know until that time whether technician A or technician B completed the jobs associated with number 8706.   In fact, if the technician list did not indicate when technician B began using number 8706—and there is no evidence that the list indicated as much—Time Warner might never know whether the June jobs were completed by technician A or technician B.

*Jacobson* is instructive in that regard. In that case, Comcast, like Time Warner here, maintained "arrival and departure data for each cable technician" and "lists of cable technicians and their employment status," among other information. *Jacobson*, 740 F. Supp. 2d at 692. Where there was "no evidence to indicate that maintenance of this type of information [wa]s used to control a technician's day to day employment, or that Comcast retain[ed] records for any purpose beyond quality control," the court found that retaining such "records is only an extension of Comcast's control procedures . . . . to ensure that Comcast receives the services for which it is entitled, and that the individuals fulfilling them are authorized to do so." *Id.*; *accord Lawrence*, 2011 WL 666304 at *9.

That reasoning is persuasive. It would be strange if "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry," *Zheng I*, 355 F.3d at 75, but records created as part of that supervision weighed in favor of finding joint employment. Since Time Warner's records correlating Metro technician numbers with particular installation jobs do not translate into Metro technicians' per hour compensation but are instead maintained largely as part of Time Warner's quality control process, those records do not weigh in favor of finding that Time Warner jointly employs the technicians.

### e.   Conclusion

In sum, the first, third, and fourth *Carter* factors weigh against finding that Time Warner jointly employed Metro technicians and the second *Carter* factor weighs almost entirely in the same direction. While there is evidence that Time Warner conducted minimal supervision beyond quality control and that Metro technicians communicated with Time Warner in certain circumstances, this evidence alone cannot sustain the

conclusion that Time Warner "possessed the power to control the workers in question" where the other *Carter* factors negate that conclusion. *Herman*, 172 F.3d at 139. Rather, the undisputed facts demonstrate that Time Warner did not exercise "formal control" over Metro technicians. *Barfield*, 537 F.3d at 143.

### 2. Functional Control

That is not the end of the matter, however, because "in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." *Zheng I*, 355 F.3d at 70. The Court must therefore apply the six factors the Second Circuit identified in *Zheng* as well as any other factors that appear relevant to determine whether Time Warner exercised functional control over Metro technicians as a matter of "economic reality."

### a.     Premises and Equipment

The first *Zheng* factor is "whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work," *id*. at 72. This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Id.* Nevertheless, the Second Circuit has cautioned that "shared premises" are not "anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship). . . ." *Id.*

The record shows that Metro technicians visit Time Warner's premises only once per year to pick up their identification cards at Time Warner's facility. (*See* Pl.'s 56.1 Stat. ¶ 64.) And it is undisputed that Metro, not Time Warner, provides Metro

technicians with tools, radios, uniforms, and, in some cases, trucks.  (*See id.* ¶¶ 48-52, 59-60, 65-69.)

Plaintiffs make several efforts to overcome this strong evidence that Metro technicians do not use Timer Warner's premises and equipment.  First, Plaintiffs argue that Metro technicians work in Time Warner's customers' homes.  (*See* Pl.'s Opp'n at 30.)  That argument makes no sense because a home belongs to the customer, not Time Warner.

Second, Plaintiffs argue that Metro technicians install equipment that belongs to Time Warner.  (*See id.*)  That argument proves too much.  Metro technicians who connect cables to Time Warner cable boxes no more "use" those boxes than garment workers use pieces of fabric.  The cable boxes and fabric are not tools used to complete the service or finish the product; they are uncompleted versions of the service or product.  Yet if finishing a product weighed in favor of finding that the producer of the product jointly employs the person finishing it, then any company that outsourced any phase of production would jointly employ anyone who did any work on the product.  That result cannot follow from applying a test that "ensures that the statute is not interpreted to subsume typical outsourcing relationships."  *Zheng I*, 355 F.3d at 76.

Finally, Plaintiffs point to evidence that Time Warner provides Metro technicians with "lock box keys."  (*See* Def.'s 56.1 Stat. ¶ 53.)  However, the fact that Time Warner provides that lone piece of equipment is overwhelmingly outweighed by what Time Warner does not provide and the fact that Metro technicians visit Time Warner facilities only once per year.  Accordingly, the first *Zheng* factor weighs against finding that Time Warner jointly employs Metro technicians.

### b.        Whether the Contractor Shifts as a Unit

The second *Zheng* factor is "whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another," *Zheng I*, 355 F.3d at 72.  This factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."  *Id.*  Nevertheless, the Second Circuit has cautioned that "the absence of a broad client base," like "shared premises," is not ""anything close to a perfect proxy for joint employment (because they are both perfectly consistent with a legitimate subcontracting relationship). . . ."  *Id.*

It is undisputed that, during the period at issue in this case, Metro technicians performed work only for Time Warner.  Hence the second factor might appear to weigh in favor of finding that Time Warner jointly employed Metro technicians.

However, the Second Circuit has described the second factor as "whether the Contractor Corporations had a business that *could* or did shift as a unit from one putative joint employer to another," *Zheng I*, 355 F.3d at 72 (emphasis added).  And the undisputed evidence shows that, as Time Warner argues, "Metro has its own resources (a warehouse, tools, vehicles, and a cadre of employees) and can seek work from any other cable company at any time."  (Defs.' Br. at 45.)  Moreover, Metro in the past provided installation services for another cable company in New York, Cablevision, as well as Dish Network in Florida.

Plaintiffs do not contest this point as a factual matter.  Rather, they argue that the Second Circuit in *Barfield* held that a defendant cannot lay claim to the second factor by showing only that a contractor could shift its business to another putative joint employer.

33

*Barfield* involved an action by a nurse who worked for Bellevue Hospital through a referral service.  Bellevue argued that the second *Zheng* factor could not be decided against it as a matter of law because it "did not concede that it was hospital policy to require the referral agencies to assign the same workers for extended periods of time." *Barfield*, 537 F.3d at 147.  The Second Circuit held that the defendants' argument "fails because they point to no record evidence indicating that agency health care workers comprised units that shifted from hospital to hospital" and could not "refute that Barfield herself was referred only to Bellevue and not to any other hospital." *Id.*  In that situation, "the second *Zheng* factor [i]s established in favor of plaintiff as a matter of law." *Id.* at 147-48.

        The Court is not persuaded that the *Barfield* court intended its statement that "Barfield herself was referred only to Bellevue and not to any other hospital" to mean that a putative defendant employer must show that the plaintiff actually shifted from one employer to another.  It would not have made sense for the Second Circuit to interpret the second factor that way when the *Zheng* court had listed "whether plaintiffs worked exclusively or predominantly for [the putative joint employer]" as a separate factor. *Zheng I*, 355 F.3d at 72.  Indeed, the Second Circuit's decision in *Zheng I* specifically noted that while the second factor "overlaps substantially" with the sixth factor, "[t]he factors are not identical . . . and capture different aspects of a business relationship's 'economic reality.'" *Id.* at 75 n.12.  In particular, the court noted that "factor (6), *but not factor (2)*, would weigh in favor of joint employment if a subcontractor worked solely for a single client but had the ability to seek out other clients at any time." *Id.* (emphasis added).  The parties agree that is the case here.  Accordingly, the second *Zheng* factor

does not weigh in favor of finding that Time Warner jointly employed Metro technicians.[10]

### c.      Whether Plaintiffs Have Discrete Line Jobs

The third *Zheng* factor is "the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer]'s process of production," *Zheng I*, 355 F.3d at 72.  "Interpreted broadly, this factor could be said to be implicated in *every* subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  *Id.* at 73 (emphasis in original). However, the Second Circuit has "not interpret[ed] the factor quite so broadly."  *Id.* Rather, the Court of Appeals has recognized a spectrum spanning from, on one end, "piecework on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process," and, on the other end, "work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology."  *Id.*

---

[10] Indeed, this case is different from *Barfield*.  There, "[a]fter making arrangements with a referral agency for temporary certified nursing assistants, Bellevue generally contact[ed] the referred individuals directly to advise as to the shifts that [would] likely need coverage" and "require[d] temporary nursing assistants to call the hospital two hours before the start of the identified shifts to determine whether their services [were], in fact, required."  *Barfield*, 537 F.3d at 136.  Thus Bellevue transacted with individual plaintiff nurses rather than with the referral agency, and that structure enabled Bellevue to exercise control when it obtained plaintiff's services.  In other words, the fact that the plaintiff did not work for other hospitals was the result of Bellevue's actions towards her. Here, however, Time Warner transacts with Metro technicians as a unit:  it contracts with Metro, sends Metro work orders, and lets Metro assign individual technicians to complete those work orders.  In those circumstances, where Time Warner does nothing to prevent Metro from contracting to assign technicians to other cable companies, the fact that the Plaintiffs do not work for other companies is not the result of Time Warner's actions towards them.  Accordingly, that fact adds nothing to any inference of control.

As these statements suggest, and as Plaintiffs concede (*see* Pl.'s Opp'n at 33), the third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product.  Nevertheless, there is little reason not to remain "mindful of the substantial and valuable place that outsourcing, along with the subcontracting relationships that come with outsourcing, have come to occupy in the American economy."  *Id.* at 73.  Nor does there appear any reason why, to the extent that the third *Zheng* factor does apply, "both industry custom and historical practice should be consulted" since "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." *Id.*

That is so here.  Several reported cases cited by the parties demonstrate that numerous cable companies across the country contract with installation companies in much the same way that Time Warner contracts with Metro.  *See Keeton*, 2011 WL 2618926; *Lawrence*, 2011 WL 666304; *Jacobson*, 740 F. Supp. 2d 683; *Smilie v. Comcast Corp.*, No. 07-CV-3231 (N.D. Ill.) (Slip Op., Feb. 25, 2009); *Santelices v. Cable Wiring and South Fla. Cable Contractors, Inc.*, 147 F. Supp. 2d 1313 (S.D. Fla. 2001); *Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667 (D. Md. 2000).

Plaintiffs cite *Zheng* for the proposition that "the very prevalence of a custom may 'be attributable to widespread evasion of labor laws." *Zheng* I, 335 F.3d at 73-74.  True enough, but that possibility does not correspond with the reality that the mine run of other courts has not found that cable companies jointly employ installation technicians who work for contractors.  That suggests that Time Warner's agreement with Metro "is unlikely to be a mere subterfuge to avoid complying with labor laws."  *Id.* at 73.  Thus

36

the most Plaintiffs can say is that the third factor does not necessarily weigh against joint employment.[11]

### d.       Whether the Contractors are Fungible

The fourth *Zheng* factor is "whether responsibility under the contracts could pass from one subcontractor to another without material changes," *Zheng I*, 355 F.3d at 72. "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity . . . rather than to an ostensible direct employer. . . ."  *Id.*  Conversely, where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists."  *Id.*

Plaintiffs argue that "all three of [Time Warner's] contractors do the same work and must follow the same specifications dictated by TWCNYC."  (Pl.'s Opp'n at 34.) However, as Time Warner points out, the Second Circuit has stated that if the fourth factor "weigh[ed] in favor of joint employment when a general contractor uses numerous subcontractors who compete for work and have *different* employees," the fourth factor "would classify nearly all subcontracting relationships as joint employment relationships—a result that finds no support either in the law or in our country's practices."  *Zheng I*, 355 at 74 n.11 (emphasis in original).  Thus the fourth factor asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, "the *same*

---

[11] Nevertheless, "Zheng contemplates arrangements under which the totality of circumstances demonstrate that workers formally employed by one entity operatively function as the joint employees of another entity, even if the arrangements were not purposely structured to avoid FLSA obligations."  *Barfield*, 537 F.3d at 146.

employees would continue to do the *same* work in the *same* place." *Id.* at 74 (emphasis in original).

There is no evidence that Metro technicians would continue installing Time Warner cable if Time Warner severed its relationship with Metro. Since the undisputed evidence shows that, rather than hiring technicians, Time Warner hires contractors who hire technicians, all the evidence suggests that "when an Installation Company dissolves, technicians wishing to continue working on behalf of [Time Warner] are required to apply and be hired for a position from another Installation Company." *Jacobson*, 740 F. Supp. 2d at 693. Accordingly, the evidence suggests that Metro technicians work for Time Warner "only to the extent that their direct employer is hired by that entity," *Zheng I*, 355 F.3d at 72. The fourth *Zheng* factor therefore weighs against finding that Time Warner jointly employs Metro technicians.

### e.    Supervision

The fifth *Zheng* factor is the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work," *Zheng I*, 355 F.3d at 72. As set forth above with respect to the second *Carter* factor, to the extent that Time Warner supervised Metro technicians, it did so almost entirely "with respect to contractual warranties of quality and time of delivery" that have "no bearing on the joint employment inquiry." *Zheng I*, 355 F.3d at 75. True, there is evidence that Time Warner supervised Metro technicians in some minimal capacity. But on balance, even considering all of the evidence in the light most favorable to Plaintiffs, the fifth *Zheng* factor weighs almost entirely against finding that Time Warner jointly employed Metro technicians.

#### f.      Whether the Contractor Works Exclusively or Predominately for One Company

The sixth *Zheng* factor is "whether plaintiffs worked exclusively or predominantly for [the putative joint employer]." *Zheng I*, 355 F.3d at 72.  The parties do not dispute that, during the time period at issue in this case, Metro technicians performed installations only for Time Warner.  Accordingly, this factor weighs in favor of finding that Time Warner jointly employed Metro technicians.

#### g.      Other Relevant Factors

A district "court is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng I*, 355 F.3d at 72.  The parties argue that several other factors are relevant.

First, Plaintiffs point to the fact that Time Warner and Metro have the same counsel in this action.  They contend that this "raises issues as to what extent Metro is [a] viable, autonomous entity with meaningful independence from its co-defendant."  (Pl.'s Opp'n at 40.)  Hardly.  Plaintiffs cite no authority for the proposition that joint representation implies joint employment and the Court is aware of none.

Second, both parties make arguments regarding how Metro technicians present themselves to third parties.  Plaintiffs point to evidence that the technicians' identification cards name Time Warner as well as Metro and that the technicians refer to Time Warner in introducing themselves.  (Pl.'s Opp'n at 41.)  For its part, Time Warner points to evidence that several of the Plaintiffs have represented to various legal authorities that Metro is their employer.  (Def.'s Br. at 25.)

The Court doubts that evidence of whether a third party has reason to believe that Time Warner jointly employs Metro technicians is relevant to determining whether that is

true as a matter of economic reality.  The economic reality test reflects an "overarching concern" for "whether the alleged employer possessed the power to control the workers in question." *Herman*, 172 F.3d at 139.  What a third party has seen or been told has almost nothing to do with whether Time Warner in fact had such a power.  In any event, even if this factor were relevant, none of the evidence that the parties have advanced with respect to it changes the balance that weights overwhelmingly against finding that Time Warner jointly employed Metro technicians.

### 3.  Conclusion

It is true that joint employment is a mixed question of law and fact and that "[m]ixed questions of law and fact are 'especially well-suited for jury determination. . . .'" *Zheng v. Liberty Apparel Co., Inc.*, 617 F.3d 182, 185 (2d Cir. 2010) ("*Zheng II*") (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir. 1999)).  However, this is one case where the Court can "conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, defendants are still entitled to judgment as a matter of law." *Zheng I*, 355 F.3d at 76.

"To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76-77 (emphasis in original).  Nevertheless, the undisputed facts show that almost every factor weighs against finding that Time Warner jointly employed Metro technicians.  The only factor weighing in favor of that finding is that Metro technicians only install cable for Time Warner.  Hence the question is whether that fact alone can as a matter of law sustain the conclusion that Time Warner jointly

employed Metro technicians.  The Court finds three reasons why the answer to that question is "no."

First, the Second Circuit has rejected the proposition that "the absence of a broad client base is anything close to a perfect proxy for joint employment" because it is "perfectly consistent with a legitimate subcontracting relationship."  *Zheng I*, 355 F.3d at 72.  Rather, the Court have appeals has suggested merely that the fact that a contractor performs work for only one business can serve "as a starting point in uncovering the economic realities of a business relationship." *Id.*

Second, it seems strange to conclude that Time Warner controls Metro technicians because Metro contracts only with Time Warner where it is undisputed that Time Warner does not control whether Metro does so.  If Time Warner prohibited Metro from contracting to provide installation services for any other cable provider, that fact along with some evidence that Time Warner supervised or otherwise controlled technicians' conditions of employment would suggest to a greater degree that Metro was separate in name only.  But where there is no evidence that Metro's contracting with Time Warner alone is the product of anything other than its own business decision, finding that Time Warner controlled Metro for that reason alone turns the economic reality test on its head.

Third, consistent with this reasoning, several courts have concluded that cable companies do not jointly employ contract technicians where the only factor weighing in favor of a contrary result was the fact that the technicians install cable for only one service provider.  *See Adderley*, 2011 WL 666304 at * 10 (granting summary judgment where "[t]he only relevant factor weighing in favor of a joint employment relationship is the fact that Adderley . . . works exclusively for Cablevision, albeit by its own choice");

*Jacobson*, 740 F. Supp. 2d at 693 (citing *Zheng I* and holding that, "by itself, the absence of a single client base is not a proxy for joint employment").

In post-briefing letters, Plaintiffs point to *Keeton v. Time Warner Cable, Inc.*, No. 2:09-CV-1095, 2011 WL 2618926 (S.D. Ohio, July 1, 2011), in which the court denied Time Warner summary judgment on the issue of whether it jointly employed cable technicians employed by contractors.  *Keeton*, however, is readily distinguishable from this case.

Noting that "Time Warner does not directly address the factors laid out in *International Longshoremen['s Association, AFL-CIO, Local Union No. 1937 v. Norfolk Southern Co.*, 927 F.2d 900 (6th Cir. 1991)]," the *Keeton* court held that Time Warner "had not met [its] burden of establishing that no genuine issue of material fact[] exists as to whether [it] jointly employed the Plaintiffs with [their contractor], Reno Services." 2011 WL 2618926, at * 7.  The *International Longshoremen* factors include "(1) the interrelation of operations between the companies; (2) common management; and (3) centralized control of labor relations, and common ownership," 927 F.2d at 902—factors not identified by the Second Circuit in *Zheng*.  *Compare Zheng I*, 355 F.3d at 72 (not listing such factors).  Applying these factors, the *Keeton* court concluded that "[a] reasonable fact-finder could take the Plaintiffs' claims as true regarding Time Warner's management of Plaintiffs' daily routes to indicate that the Plaintiffs were both working under a centralized control of labor relations and [that] Reno Services and Time Warner had interrelated operations, fulfilling two of the three *Int'l Longshoremen* factors."  *Id.* at *7.  Indeed, the Plaintiffs alleged that they "beg[an] their days by reporting to a Time Warner facility to receive their work orders"; "that once they reported to a Time Warner

facility at the beginning of the day, a Time Warner technician would print, organize, and distribute the work orders among the various installers"; "that they then filled out route sheets to give to a Time Warner dispatcher before departing to start their routes"; that they "had to receive permission from the Time Warner dispatcher before they could change the order in which they filled the work orders assigned to them on a particular day"; and "that if they had doctor's appointments, they would inform Time Warner so that the dispatcher could schedule their route around the appointment." *Id.* at *6.

As set forth above, the undisputed evidence here shows just the opposite:  Metro technicians report to work at Metro's facility, receive work orders organized by Metro, and report their absences or late arrivals to Metro.  No reasonable fact-finder could infer "interrelation of operations" between Metro and Time Warner or "centralized control of labor relations" from that evidence.  *Id.* at *7.  Hence even taking into account the factors with respect to which the *Keeton* court found that the plaintiffs' evidence created a material issue of fact, those factors create no such issue here.

43

## CONCLUSION

For the foregoing reasons, Time Warner's motion **[121]** for summary judgment is GRANTED.


SO ORDERED.

Dated: New York, New York
       September **30**, 2011

                                                    _____
                                                           Richard J. Holwell
                                                      United States District Judge